IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re THE TRULAND GROUP, INC., et al., )
)
Debtors. )
_____ )
)
)
MYERS CONTROLLED POWER, LLC, )
) 1:18-cv-979 (LMB/IDD)
Appellant, ) Bankr. No. 16-1151 (BFK)
)
v. )
)
H. JASON GOLD, in his capacity as trustee for )
The Truland Group, Inc., et al., )
)
Appellee. )

## MEMORANDUM OPINION

Before the Court is Myers Controlled Power, LLC's ("Myers" or "appellant") appeal from an order of the bankruptcy court in this adversary proceeding granting judgment in favor of H. Jason Gold, the trustee ("trustee" or "appellee") for the avoidance and recovery of a preference in the amount of $2,107,039.86, along with prejudgment interest at the federal rate. The appeal has been fully briefed,[1] and the Court finds that oral argument would not aid the decisional process. For the reasons stated below, the judgment of the bankruptcy court will be affirmed.

---

[1] The documents that formed part of this Court's review included the record before the bankruptcy court [Dkt. Nos. 6-9]; the bankruptcy court's Memorandum Opinion, see Gold v. Myers (In re Truland Grp., Inc.), No. 16-1151 (Bankr. E.D. Va. July 23, 2018) ("Mem. Op."); the Brief of Appellant Myers Controlled Power, LLC [Dkt. No. 12] ("Appellant's Br."); the Brief of Appellee H. Jason Gold, Trustee [Dkt. No. 13] ("Appellee's Br."); and the Reply Brief of Appellant Myers Controlled Power, LLC [Dkt. No. 14] ("Appellant's Reply").

# I. BACKGROUND

This dispute arises out of a large-scale construction project related to the Washington Metropolitan Area Transit Authority's ("WMATA") Orange and Blue Lines. Mem. Op. 1-2. WMATA engaged Clark Construction Group, LLC ("Clark") to serve as the prime contractor for the $273 million renovation. Id. at 2. Clark then subcontracted with Truland Walker Seal Transportation, Inc. ("TWST"), one of several affiliated companies performing electrical contracting work under the name "Truland." Id. at 1-2. Among other terms, the subcontract between Clark and TWST included a "flow-down" provision requiring TWST to pay all subcontractors and suppliers to prevent those parties from making any claims against the surety that guaranteed TWST's performance. Id. at 2. TWST ultimately decided to use Myers, the appellant, as a second-tier subcontractor to provide necessary electrical equipment and switches. Id. at 2-3. Myers did not contract with TWST directly; rather, it signed a supplier subcontract with Nationwide Electrical Services, Inc. ("NES"), a disadvantaged business enterprise.[2] Myers sent all but one of its invoices to NES.[3] Id. at 3. Even so, "Myers took its directions exclusively from TWST, not from NES." Id.

---

[2] A "disadvantaged business enterprise" is "a for-profit small business concern . . . [t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged"—that is, "who ha[ve] been subjected to racial or ethnic prejudice or cultural bias within American society because of [their] identity as . . . members of groups and without regard to [their] individual qualities." 49 U.S.C. § 26.5. See generally 49 U.S.C. pt. 26 (setting out the Department of Transportation's regulations governing the participation of disadvantaged business enterprises in projects receiving federal aid). The total amount of the Myers–NES supplier subcontract was $17,014,113.00, and that subcontract also contained a flow-down provision.

[3] The bankruptcy court found that there was no signed, written subcontract between NES and TWST. Mem. Op. 4. Nonetheless, the parties certainly behaved as though there were such a contract: NES sent invoices to TWST labeled as "[b]illing for Myers Controlled Power" to pay for the electrical equipment Myers provided. Clark would then issue checks that were jointly payable to TWST and NES. Id. at 3.

The Truland companies ran into serious financial difficulties in the spring of 2014 and became unable to make the required flow-down payments to their suppliers and subcontractors. Mem. Op. 4. As unpaid invoices began to accumulate, Myers notified TWST and Clark that it would cease delivering equipment until payments resumed. Id. Because TWST's financial difficulties were threatening the schedule of the overall project, the parties began searching for alternative arrangements. Myers initially sought direct payment and a guarantee from Clark. Clark refused, insisting instead on an arrangement in which checks made jointly payable to Myers and TWST would be sent to TWST for endorsement and then delivered to Myers. Id. at 5. Based on Clark's representations about this arrangement, Myers released equipment worth approximately $1.8 million on May 27, 2014. Id. at 6. The parties executed the Joint Check Agreement ("JCA") on June 16, 2014, and two days later, Myers released additional equipment worth over $250,000. Id. On July 11, 2014, Clark delivered a check made jointly payable to TWST and Myers in a total amount of $2,107,039.86; TWST endorsed the check, returned it to Clark, and Clark forwarded it to Myers. Id.

TWST filed a Chapter 7 bankruptcy petition on July 23, 2014. TWST's petition was jointly administered with those of The Truland Group, Inc. and the rest of its subsidiaries (collectively, "debtors"). The trustee instituted this adversary proceeding in July 2016, seeking to recover the $2,107,039.86 paid to Myers under the JCA as an avoidable transfer under 11 U.S.C. § 547(b). Myers opposed the trustee's efforts on several grounds, including that Myers was not a creditor of TWST or any of the other debtors at the time of the alleged transfer; that the joint check was not TWST's "property," at least for purposes of bankruptcy law, at the time of the transfer; and that the transfer was not avoidable because it was a substantially contemporaneous exchange for new value under 11 U.S.C. § 547(c).

The bankruptcy court held a trial on the merits in February and March of 2018. Based on the parties' written submissions and the evidence adduced at trial, the bankruptcy court found that Myers was TWST's creditor at the time of the transfer in July 2014; that the joint check was properly part of the bankruptcy's estate as of that date; that the JCA and resulting payment constituted an avoidable transfer from TWST to Myers; and that although the parties had intended to effect an exchange for new value through the JCA, that exchange was not "substantially contemporaneous" and thus was not covered by § 547(c)'s defense to avoidance. The bankruptcy court concluded that the trustee was entitled to recovery of the $2,107,039.86 transfer along with prejudgment interest at the federal rate, as calculated from the date of filing of the adversary proceeding. Myers timely filed this appeal.

## II. DISCUSSION

The bankruptcy court had jurisdiction over this dispute under 28 U.S.C. § 1334 and the Order of Reference entered on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), and the Court has jurisdiction over Myers's appeal under 28 U.S.C. § 158(a). On appeal, the bankruptcy court's legal determinations are reviewed de novo, and its factual findings are reviewed for clear error. Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.), 453 F.3d 225, 231 (4th Cir. 2006); see First Owners' Ass'n of Forty Six Hundred Condo., Inc. v. Gordon Props., LLC (In re Gordon Props., LLC), 516 B.R. 323, 327 (E.D. Va. 2014) ("A district court sitting as an appellate court in a bankruptcy proceeding reviews the [bankruptcy] court's legal conclusions de novo. . . . [F]indings of fact will be overturned only if consideration 'of the entire record leaves [the reviewing court] with the definite and firm conviction that a mistake has been committed.'" (third alteration in original) (quoting Harman v. Levin, 772 F.2d 1150, 1153 (4th Cir. 1985))).

## A. Avoidable Transfer

Under the Bankruptcy Code,

> the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> > (A) on or within 90 days before the date of the filing of the petition; or
> >
> > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The bankruptcy court found that the $2,107,039.86 payment to Myers was an avoidable transfer under § 547(b). Myers challenges that finding on two grounds, arguing first that "the funds transferred to Myers by means of the Joint Check were [not] 'an interest of the debtor in property,'" Appellant's Br. 11, and second that Myers was not a "creditor" of TWST at the time of the transfer. Neither argument is persuasive.

### 1. Interest of the Debtor in Property

Myers' argument that the funds TWST conveyed to it under the JCA were not "an interest of [TWST] in property" under § 547(b) rests on <u>Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.</u>, 790 F.2d 1121 (4th Cir. 1986). That case involved a similar fact pattern: A primary contractor entered into a joint check agreement with the subcontractor debtor and the supplier appellee in which a check drawn by the primary contractor would be delivered to the debtor "in trust for the benefit of" the appellee, which under the agreement "was entitled to

5

receive and retain the Check." Id. at 1122. Construing Virginia law, the Mid-Atlantic court ruled that the subcontractor debtor had held the joint check in constructive trust in favor of the supplier appellee and thus lacked equitable title over the check's proceeds. Id. at 1126-27. The court accordingly held that the proceeds of the check did not qualify as "an interest of the debtor in property" under § 547(b). Id. at 1127-28; see also In re Williams, 338 B.R. 678, 683 (Bankr. E.D. Va. 2004) (holding that where a "debtor's interest in . . . property is held exclusively for the use and benefit" of another, "this type of interest is not an asset of [the] debtor's bankruptcy estate").

The bankruptcy court recognized Mid-Atlantic as controlling authority but held that the JCA itself was a preference that, because it was effected within 90 days of the filing of the petition, could be subject to avoidance under § 547(b). Mem. Op. 14-15 (citing Napolitano v. Vibra-Conn, Inc. (In re R.J. Patton Co.), 348 B.R. 618, 625 (Bankr. D. Conn. 2006) (holding that a similar joint check arrangement qualified as a transfer of the debtor's property within the 90-day preference period), and Dal-Tile Corp. v. Reitmeyer (In re Buono), 119 B.R. 498, 501 & n.1 (Bankr. W.D. Pa. 1990) (same)). The bankruptcy court observed that the parties agreed to the JCA only "after TWST was in material default, after TWST was deeply out of trust with its suppliers, after Myers refused to release the equipment, and within the 90-day preference period." Id. at 15. Concluding that one "preference (the JCA) can[not] save a[nother] preference (the payment)," the bankruptcy court found that the joint check and its proceeds were properly considered to be property of the debtor's estate for purposes of § 547(b).

This Court agrees that to the extent the $2,107,039.86 joint check endorsed by TWST and delivered to Myers can be deemed to have been held by TWST in constructive trust in favor of Myers, that constructive trust only came into existence through the JCA, which undisputedly was

6

executed within the 90-day window under § 547(b)(4)(A), and which the bankruptcy court correctly characterized as a transfer. The bankruptcy court also correctly applied the principles set forth in cases like R.J. Patton and Buono to conclude that the check proceeds were part of TWST's estate for purposes of § 547(b). The bankruptcy court's conclusion thus rests on an appropriate finding that the JCA and the joint check issued under the JCA constituted an inseparable two-part process in which TWST agreed to transfer its interest in that payment from Clark to Myers. Indeed, Myers "does not dispute" the conclusion "that a joint check agreement can be an avoidable transfer under section 547(b)"; instead, it asserts that R.J. Patton and Buono are inapposite because those cases featured defendants that "were clearly owed an antecedent debt at the time they entered into their respective joint check agreements" and that had failed to "assert[] a valid section 547(c) defense [to] protect[] their transfers from avoidance." Appellant's Br. 15 n.9. That is, although Myers argues that it was not TWST's creditor during the relevant period and that the transfer effected by the JCA and joint check cannot be avoided under § 547(c)(1), it does not squarely challenge the bankruptcy court's conclusion that one preference cannot save another.[4] Accordingly, this aspect of the bankruptcy court's order will be affirmed.

### 2. Creditor–Debtor Relationship

To be subject to avoidance, the transfer of a debtor's interest in property must (among other things) have been "to or for the benefit of a creditor . . . for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(1)-(2). The

---

[4] Both before the bankruptcy court and in this appeal, Myers also argued that Clark's subcontract with TWST created an express or implied trust for its benefit. The Court concludes that for the reasons stated in the bankruptcy court's opinion, that argument is without merit.

Bankruptcy Code defines "creditor" as any "entity that has a claim against the debtor." See id. § 101(10)(A). "Claim," in turn, is defined broadly to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," id. § 101(5)(A), and any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured," id. § 101(5)(B). In light of these broad definitions, see Johnson v. Home State Bank, 501 U.S. 78, 83 (1991) ("Congress intended by this language to adopt the broàdest available definition of 'claim.'"), and the purpose of the Bankruptcy Code provision on avoidable transfers, the bankruptcy court concluded that Myers qualified as a "creditor" of TWST during the relevant period because, under the relevant state law,[5] Myers would have had a claim in quantum meruit against TWST

---

[5] The bankruptcy court concluded that although it was unclear whether Virginia or D.C. law governed this dispute, the jurisdictions' quantum meruit doctrines were "not materially different." Mem. Op. 9-10. On appeal, neither party has objected to that ruling. See, e.g., Appellant's Br. 25 ("Whether Virginia or D.C. law applies is immaterial, as the elements for a claim of quantum meruit are essentially the same in both jurisdictions.").

Virginia law "impl[ies] a promise to pay for goods received under a quasi-contract theory that rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another." Centex Constr. v. Acstar Ins. Co., 448 F. Supp. 2d 697, 707 (E.D. Va. 2006) (internal quotation marks omitted) (quoting Kern v. Freed Co., 299 S.E.2d 363, 364-65 (Va. 1983)). To establish a claim for quantum meruit, the plaintiff must establish three elements: (i) a "benefit conferred on the defendant by the plaintiff"; (ii) "[k]knowledge on the part of the defendant of the conferring of the benefit"; and (iii) "[a]cceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." Id. (quoting Nossen v. Hoy, 750 F. Supp. 740, 744-45 (E.D. Va. 1990).

Under D.C. law, "[o]ne seeking recovery on a quantum meruit theory must show (1) that valuable services were rendered, (2) to the person from whom recovery is sought, (3) which services were accepted by that person, and (4) under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person." Dorsky Hodgson & Partners,

8

for the benefit of the equipment it had delivered to TWST. See Mem. Op. 9-12 (citing, inter alia, Restatement (Third) of Restitution and Unjust Enrichment § 251(1) (Am. Law Inst. 2011) ("If the claimant renders to a third person a contractual performance for which the claimant does not receive the promised compensation, and the effect of the claimant's uncompensated performance is to confer a benefit on the defendant, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment."), and id. cmt. c, illus. 15 ("Owner contracts with A to construct a building. A subcontracts part of the work to B. B in turn subcontracts part its work to C. C performs under its contract; B defaults and becomes insolvent. C has not been paid by either B or A. A has been paid in full by Owner, but A has paid no one for the work done by C. C has a claim against A under this section for the value of its performance.")).

Myers argues that the bankruptcy court's conclusion was erroneous because any benefit conferred by the release of its equipment inured to "Clark and/or WMATA," not to TWST. See, e.g., Appellant's Br. 26-27. This argument is unpersuasive. TWST had a contractual obligation to deliver the equipment to Clark under the subcontract. Even granting that TWST immediately relinquished its title to the equipment to Clark by signing bills of sale upon Myers's delivery of the equipment, that delivery still conferred a benefit upon TWST, which became able to satisfy its contractual duty to Clark (and thereby entitled itself to the contract cost with respect to that equipment). Accordingly, the bankruptcy court correctly concluded that the $2,107,039.86 joint check endorsed by TWST and delivered to Myers pursuant to the JCA constituted an avoidable transfer for purposes of § 547(b).[6]

---

Inc. v. Nat'l Council of Senior Citizens, 766 A.2d 54, 58 (D.C. 2001) (internal quotation marks and citation omitted).

[6] As part of its conclusion that the JCA and $2,107,039.86 joint check payment constituted an avoidable transfer, the bankruptcy court also found that Myers, if successful in its attempt to

9

## B. Substantially Contemporaneous Exchange

Section 547 of the Bankruptcy Code provides that a trustee may not avoid an otherwise avoidable transfer if the transfer was "intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor" and was "in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1). In establishing this statutory defense to avoidance, Congress "intended . . . to encourage creditors to continue to deal with troubled debtors by prevent[ing] trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt." Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists, Inc.), 709 F.3d 388, 397-98 (4th Cir. 2013) (second alteration in original) (internal quotation marks and citation omitted). Whether an exchange is substantially contemporaneous is a "flexible" standard that depends on the individual circumstance of each case. See Gordon v. Novastar Mortg., Inc. (In re Hedrick), 524 F.3d 1175, 1190 (11th Cir. 2008); Lindquist v. Dorholt (In re Dorholt, Inc.), 224 F.3d 871, 874 (8th Cir. 2000); Pine Top Ins. Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 969 F.2d 321, 328 (7th Cir. 1992).

The bankruptcy court made two findings with respect to Myers's § 547(c) defense. First, the court concluded "that the evidence of the parties' intent" surrounding Myers' release of the equipment in anticipation of the JCA "establishes a mutual intent to create a substantially

---

prevent avoidance, would be in a much better position than other unsecured creditors of TWST or other Truland companies, as uncontradicted testimony revealed that it is "extraordinarily unlikely" that unsecured creditors will receive any distribution in the Chapter 7 proceeding. Mem. Op. 7; see 11 U.S.C. § 547(b)(5) (providing that a transfer is avoidable only if, among other things, it "enables [the] creditor to receive more than such creditor would receive if . . . the case were a case under chapter 7 of this title; . . . the transfer had not been made; and . . . such creditor received payment of such debt to the extent provided by the provisions of this title").

contemporaneous exchange for new value." Mem. Op. 17 (citing 11 U.S.C. § 547(c)(1)(A)). That finding has not been challenged on appeal. Second, the bankruptcy court concluded that the exchange was not "in fact . . . substantially contemporaneous" for purposes of § 547(c)(1)(B). In reaching that conclusion, the bankruptcy court considered three dates: May 27, 2014, the date on which Myers released the vast majority of the equipment; June 18, 2014, the date Myers released the smaller, remaining portion of the equipment; and July 11, 2014, the date the joint check was issued. Mem. Op. 19. The bankruptcy court determined that the 45- and 23-day gaps between the equipment releases and the date of issuance of the joint check were "simply too long to be considered truly 'contemporaneous.'"

Myers argues that the bankruptcy court erred by failing to consider two other dates: (i) that of the creation of an oral joint check agreement created either by Clark's promise to agree to such an arrangement on May 13, 2014 or by Myers's acceptance of the agreement through its May 27, 2014 release of equipment; and (ii) June 16, 2014, the date the written JCA was executed. Myers argues that the bankruptcy court's conclusion that one transfer cannot save another should have led it to compare the dates when Myers released its equipment to the effective dates of the oral or written JCAs, not to the date of issuance of the joint check. And it argues that had the bankruptcy court done so, it would have concluded that the equipment releases were substantially contemporaneous with either of those agreements.

This argument fails for several reasons. For one, as the trustee points out, Myers did not argue before the bankruptcy court that an oral joint check agreement had been created on or before May 27, 2014, and accordingly Myers should be barred from pursuing that argument for the first time on appeal. Cf. Campbell v. Bos. Sci. Corp., 882 F.3d 70, 80 (4th Cir. 2018) (arguments raised for the first time on appeal are ordinarily not considered). Even if that

11

argument were not foreclosed, the bankruptcy court's findings that the joint check agreement did not enter into force until June 16, 2014 and that any actions taken by Myers, TWST or Clark before that date were merely in anticipation of the execution of that agreement were amply supported by the evidence in the record. The contrary evidence to which Myers points—namely, Clark's May 13, 2014 email stating that it would agree to a joint check agreement, an email from TWST three days later stating that it would "continue to work with Clark to pay [Myers] via joint checks," and Myers's May 27, 2014 release of equipment—demonstrates only that the parties were moving toward an agreement, not that a binding and enforceable agreement had already been created. Accordingly, the Court does not find that the bankruptcy court clearly erred or misapplied the law in declining to consider any May 2014 oral agreement in analyzing whether Myers' release of equipment was part of a substantially contemporaneous exchange.

Myers's argument that the bankruptcy court should have considered the JCA's date of entry is similarly unsuccessful for both factual and legal reasons. The more substantial equipment release, worth approximately $1.8 million, occurred on May 27, 2014, but the JCA did not become effective until 21 days later, on June 16, 2014. Concluding that a 21-day delay between supplying equipment and an agreement to pay for that delivery is not a substantially contemporaneous exchange is not out of line with case law interpreting § 547(c)(1)(B). Cf. Wasserman v. Vill. Assocs. (In re Freestate Mgmt. Servs., Inc.), 153 B.R. 972, 984 (Bankr. D. Md. 1993) (holding that a 24-day delay between the making of a loan and its repayment "prevent[ed] the exchange from being substantially contemporaneous in fact"). Even more importantly, the execution of the JCA and the delivery of the joint check formed part of an inseparable two-part process to secure Myers's release of the equipment. For purposes of § 547(c), it was neither clearly erroneous nor contrary to law for the bankruptcy court to have

used the date the joint check was issued in considering whether the exchange at issue was in fact contemporaneous. That joint check was not issued until July 11, which was 45 days after the first release of equipment and 23 days after the second release. Because the bankruptcy court's decision in this discretionary area was neither clearly erroneous nor contrary to law, it will not be disturbed.[7]

### C. **Prejudgment Interest**

Finally, Myers challenges the bankruptcy court's award of prejudgment interest at the federal rate calculated from when the trustee's complaint was filed. It is "well-settled" that bankruptcy courts have discretion to award prejudgment interest in actions to recover avoidable transfers "and to compute that interest from the date of demand for the return of the transferred funds." Sigmon v. Royal Cake Co. (In re Cybermech, Inc.), 13 F.3d 818, 822 (4th Cir. 1994). Such an award "serves to 'compensate the debtor's estate for [the transferee's] use of . . . funds that were wrongfully withheld from the debtor's estate during the pendency of the'" adversary proceeding. Id. at 822-23 (quoting Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.), 4 F.3d 1556, 1566 (10th Cir. 1993)).

Myers argues that the bankruptcy court "failed to provide any analysis" with respect to its award of prejudgment interest. Appellant's Br. 27. The record does not support Myers's argument. The bankruptcy court's opinion cites In re Cybermech, which explains why prejudgment interest can serve a beneficial compensatory purpose. Mem. Op. 19 (citing 13 F.3d at 822). It also cites Gelzer v. Fleck (In re ContinuityX, Inc.), 569 B.R. 29 (Bankr. S.D.N.Y.

---

[7] Myers argues that the bankruptcy court's decision "will cause a meaningful disruption to the industry" by rendering "the commonly used joint check remedy vulnerable, if not worthless." Appellant's Br. 29. That policy argument is better addressed to Congress.

2017), for the proposition that such interest "should be awarded unless [there is] sound reason not to." Mem. Op. 19; see also In re ContinuityX, 569 B.R. at 40 (emphasizing that prejudgment interest serves "to restore the estate to the full value of the asset transferred in order to compensate it for the loss of time value of the asset" (citation omitted)). These citations demonstrate that the bankruptcy court determined that prejudgment interest was appropriate under the circumstances of this dispute and that Myers had failed to identify any good reason why such interest should not be awarded. The Court finds no clear error or abuse of discretion in that determination.

## III. CONCLUSION

For the reasons stated above, the judgment entered by the bankruptcy court will be affirmed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 24th day of May, 2019.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge